## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## COLUMBIA DIVISION

| | | |
|---|---|---|
| American Acceptance Corporation of SC on behalf of itself and all others similarly situated, | ) ) ) ) | Civil Action No: 3:24-cv-1099-SAL |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| John Gietz, James Westbury, Sandra Black, Jesse Laintz, Joel M. Deason, Lexington County Sheriff's Department, and Sheriff Bryan "Jay" Koon in his official capacity, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

Pursuant to Fed. R. Civ. P. 56, American Acceptance Corporation of SC ("the Plaintiff") moves for summary judgment on all causes of action as there is no genuine dispute as to any material fact and the Plaintiff is entitled to judgment as a matter of law.

## UNDISPUTED FACTS

### *Background*

1. The Plaintiff is a corporation organized and existing under the laws of the State of South Carolina and maintains its principal place of business in Myrtle Beach, South Carolina. (Exhibit 1 – Horne Aff. par. 3).

2. The Plaintiff is a creditor engaged in the business of financing motor vehicles and motorcycles ("collateral"). (Exhibit 1 par. 4).

3. The Lexington County Sheriff's Department ("LCSD") is a political subdivision of the state. (ECF No. 8 par. 32; ECF No. 21 par. 18).

4. John Gietz ("Gietz"), James Westbury ("Westbury"), Sandra Black ("Black"), Jesse Laintz ("Laintz"), and Joel M. Deason ("Deason") reside in Lexington County and are employed by Sheriff Bryan "Jay" Koon ("Koon"), the Sheriff of Lexington County. (ECF No. 8 par. 27 -33; ECF No. 21 par. 18).

5. Gietz has been certified as a law enforcement officer since February 2013 and serves as a Deputy with the LCSD with the rank of Senior Investigator. (ECF No. 8 -13).

6. Deason serves as general counsel for the Sheriff and maintains an office at the LCSD. (ECF No. 8 par. 10; ECF No. 21 par. 8).

7. Deason is named as a "contributor" to the *Asset Forfeiture Guidebook*, published by the South Carolina Sheriff's Association and last updated on October 16, 2019. (Exhibit 2 – South Carolina Sheriff's Association, *Asset Forfeiture Guidebook* (2019). https://www.scstatehouse.gov/CommitteeInfo/HouseEquitableJustice/Sheriffs'%20Asset%20Forfeiture%20Guidebook%20FINAL.pdf. ( *Asset Forfeiture Guidebook*")).

8. The "Introduction to the Asset Forfeiture Guidebook" provides, in pertinent part, "The *Asset Forfeiture Guidebook* will underscore the notion that due process is and must remain at the very core of the asset forfeiture process in our state." (Exhibit 2, p. 4).

9. Chapter 2 of the *Asset Forfeiture Guidebook*, "Seizures Pursuant to South Carolina Code of Laws," provides, in pertinent part, "It is important to note that there is a distinction between the seizure of property and forfeiture of that property. The seizure of property refers to taking that property into custody so that it is no longer in the owner's possession. The forfeiture of property refers to the termination of an owner's right to the seized property." (Exhibit 2, p. 8).

10. Chapter 3 of the *Asset Forfeiture Guidebook*, "Consent Orders," further provides, in pertinent part, "*REMEMBER: Defendant/Claimant/Interested Owner(s)' due process rights are both statutory (§44-53-530) and constitutional (14th amendment, cannot deprive one of life, liberty

*or property* without due process).  Rights can, of course, be waived, but what will the test be? Was the waiver KNOWING, VOLUNTARY, INTELLIGENT?"  (Exhibit 2, p. 25).

11.  LCSD deputies, including Gietz, collect evidence in connection with criminal activity.  (Exhibit 18 – Affidavit of Henry Dukes and ECF No. 8. par 6; ECF No. 21 par. 6).

12.  LCSD deputies, including Westbury, Black, and Laintz, serve as evidence custodians.  (ECF No. 8 par. 9; ECF No. 21 par. 7).

*The Named Plaintiff's Property Interests*

13.  In the ordinary course of business, the Plaintiff purchases retail installment contracts from sellers engaged in consumer sales.  (Exhibit 1, par. 5).

14.  The contracts purchased by the Plaintiff provide it with a security interest in the collateral.  (Exhibit 1, par. 6).

15.  The contracts provide for installment payments and include additional terms regarding default and remedies.  (Exhibit 1, par. 7).

16.  The contracts provide that the Buyer will be in default if he fails to make a payment as required by the contract or if the prospect of payment, performance, or realization on the collateral is significantly impaired.  (Exhibit 1, par. 8).

17.  Under the terms of the contracts, in the event of default, the Plaintiff may immediately take possession of the collateral by legal process or self-help, but in doing so it may not enter into a dwelling used as Buyer's current residence, use force, or otherwise breach the peace.  (Exhibit 1, par. 9).

18.  On January 30, 2021, Timothy Harold Brock ("Brock") made, executed, and delivered to Capital City Cycles ("CCC") a contract for the purchase of a 2012 Harley-Davidson FLHX STREET GLIDE (VIN: 1HD1KBM19CB679464) wherein and whereby Brock promised to pay CCC the principal sum of $10,994.00 with interest at the rate of 19.00% per annum in 54 payments of $304.40 per month beginning on March 1, 2021.  (Exhibit 1, par. 10, Ex. 1).

19. On the same date, CCC assigned the contract to the Plaintiff. (Exhibit 1,par. 11 and Ex. 1, page 5).

20. The South Carolina Department of Motor Vehicles ("SCDMV") issued a certificate of title in Brock's name as owner and listed the Plaintiff as first lienholder. (Exhibit 1, par. 12 and Ex. 2).

21. The Plaintiff received its last payment from Brock on October 7, 2022. (Exhibit 1, par. 13).

22. On July 13, 2021, Shane Adam Andrzejewski ("Andrzejewski") made, executed, and delivered to CCC a contract for the purchase of a 2007 Harley-Davidson FXDB DYNA STREET BOB (VIN: 1HD1GX414K312914) wherein and whereby Andrzejewski promised to pay CCC the principal sum of $5,656.80 with interest at the rate of 14.69% per annum in 48 payments of $156.55 per month beginning on August 12, 2021. (Exhibit 1, par. 14 and Ex. 3).

23. Thereafter, CCC assigned the contract to the Plaintiff. (Exhibit 1, par. 15 and Ex. 3, page 5).

24. SCDMV issued a certificate of title in Andrzejewski's name as owner and listed the Plaintiff as first lienholder. (Exhibit 1, par. 16 and Ex. 4).

*Seizure of Property without Notice to the Plaintiff*

25. On October 8, 2022, Westbury submitted an affidavit to secure a search warrant for Andrzejewski's home concerning a shooting incident resulting in Brock's death in the vicinity of a Waffle House at 1036 S. Lake Drive in Lexington, South Carolina. (Exhibit 3 – Def. Init. Discl. 006).

26. Westbury's affidavit indicated that "multiple individuals (wearing 'Red Devil's' [*sic*] MC vest, along with a red sweatshirt/shirts) approached at a high rate of speed on motorcycles (red. black, blue) and proceeded to shoot multiple times. As a result of this investigation, detectives determined the suspects involved were observed wearing clothing identifying them as members of the motorcycle club 'Red Devils,' who are also known to be a supporting club of the 'Hells Angels.' These individuals were wearing 'Red Devil's' [*sic*] vest [*sic*], and red sweatshirts/shirt on security footage before and after the incident. Search warrants were obtained for the 'Red

Devil's' [sic] clubhouse, resulting in the seizure of multiple communication devices along with trafficking weight cocaine." (Exhibit 3, p. 006).

27.  On or about October 9, 2022, the motorcycles were seized as arrest evidence.  (ECF No. 8 par. 53;  ECF No. 21 par. 22).

28.  The Plaintiff received its last payment from Andrzejewski on November 1, 2022.  (Exhibit 1, par. 17).

29.  On November 1, 2022, the Plaintiff was notified by Brock's sister that he had been involved in the incident and that his motorcycle was being held by law enforcement.  (Exhibit 1, par. 18).

30.  On November 29, 2022, the Plaintiff learned through social media that Andrzejewski had been involved in the same incident.  (Exhibit 1, par. 19).

31.  The Plaintiff's Vice President of Operations, Jonathan Horne ("Horne"), believed that the incident constituted an event of default since the prospect of payment, performance, or realization on the motorcycles was significantly impaired.  (Exhibit 1, par. 1 and par. 20).

*Defendants Refuse to Provide the Plaintiff with an Opportunity to be Heard*

32. On or about December 20, 2022, Horne contacted Laintz. (Exhibit 1, par. 21).

33.  Laintz advised Horne that it would be several years before the Plaintiff could recover the motorcycles.  (Exhibit 1, par. 21).

34.  On December 27, 2022, Horne followed up with Laintz by email. (Exhibit 1, par. 22 and Ex. 5).

35.  Laintz copied Horne on his email to Westbury and Black, asking for their assistance and requesting that they handle Horne's request for an inspection.  (Exhibit 1, par. 22 and Ex. 5).

36.  On December 29, 2022, counsel for the Plaintiff submitted an informal request for an incident report to LCSD.  (ECF No  8 par. 63 and ECF No. 8-6; ECF No. 21 par. 29).

37.  Twenty-two (22) days later, LCSD referred counsel for the Plaintiff to LCSD's Freedom of Information Act ("FOIA") department.  (ECF No. 8 par. 64 and ECF No.8-7; ECF No.  21 par. 29).

38.  On January 24, 2023, the Plaintiff's insurance coordinator/administrative assistant, Grace Dean, spoke with Westbury and arranged an inspection of the Brock motorcycle.  (Exhibit 1, par. 23 and Ex. 6).

39.  On January 27, 2023, counsel for the Plaintiff submitted a formal FOIA request.  (ECF No. 8 par. 65 and ECF No. 8-8; ECF No. 21. par. 29).

40.  On January 30, 2023, the Plaintiff filed and served a summons and complaint for claim and delivery regarding the Brock motorcycle (Case No. 2023-CP-32-0304) (Exhibit 4) and a summons and complaint for claim and delivery regarding the Andrzejewski motorcycle (Case No. 2023-CP-32-0302) (Exhibit 5) in South Carolina state court. (ECF No. 8 par 66; ECF No. 21 par. 30).

41.  On February 6, 2023, Deason sent an email to Assistant Solicitors Robert E. McNair, III ("McNair") and Luke Pincelli ("Pincelli") concerning the Plaintiff's property. (Exhibit 3, pp. 009 - 10).

42.  Deason advised, in pertinent part, "The sheriff's office has been sued by lien creditors for possession of two motorcycles driven by the victim and the offender that we are holding in evidence for the case above.  Capt. Laintz tells me that they are essential evidence in the crime (especially the Harley the defendant was riding) . . . I've done some research and think we should get the benefit of doubt and retain possession if they merely have the potential to be evidence.  The practical matter is that the moment this guy pleads guilty or is convicted our custodian has a duty to keep them for many years based on the evidence preservation act; however, it is my understanding that its ok to get rid of them prior to that moment.  Please know that I do not want to hinder prosecution, but I also haven't heard of cars and motorcycles's [*sic*]

being driven into court. My main question – would it be ok to take a bunch of pictures &/or

video of these motorcycles and give them to the lien holders or is that too big of a risk in case

the pictures/data gets lost or destroyed?  Please let me know what you think and don't let this

cause stress.  If you're the least bit worried, I'll litigate and try to keep the motorcycles."

(Exhibit 3, p. 010).

43.  Deason thus admitted that the Evidence Preservation Act, S.C. Code Ann. § 17-28-300 *et seq*.,

plays no role in the Defendants' retention of the property prior to a conviction or adjudication.

(Exhibit 3, p. 010).

44.  Deason did not allege that "the Defendants are not the individuals responsible for" the

deprivation of the Plaintiff's property, nor did Deason allege that a controversy properly existed

"between Plaintiff and the Solicitor's Office." (Exhibit 3, p. 010; *see* ECF No. 19 pages 6 - 8).

45. On February 7, 2023, McNair responded to Deason, stating, "I don't think there's a need to keep

the bikes in evidence if we have already photographed them . . ."  (Exhibit 3, p. 009).

46.  On February 9, 2023, Deason sent a lengthy email to counsel for the Plaintiff.  (ECF No. 8 par.

67 and ECF No. 8-9; ECF No. 21 par. 31).

47.  Therein, Deason acknowledged the filing of the claim and delivery actions "on behalf of a

lienholder and receipt of the FOIA request for the related incident reports", and further

indicated that he "would like to release the subject bikes to the lienholder" without jeopardizing

the prosecution.  (ECF No. 8-9).

48.  However, Deason also indicated that the "motorcycles [were] essential evidence" in pending

criminal cases and represented that "[t]he law states that if the bikes are even closely related to

evidence, LCSD will be allowed to retain possession – See Palmetto State Bank v. English 181

S.C. 69 (1936)." (ECF No. 8-9).

49.  Deason concluded by requesting dismissal of the suits, and represented that if they were not dismissed, he "[intended] to seek reimbursement for the unnecessary work via the frivolous proceedings act."  (ECF No. 8-9).

50.  Deason did not refer the Plaintiff to any formal process for adjudicating the Defendants' continued possession of the property. (ECF No. 8-9).

51.  Counsel for the Plaintiff responded by email on February 13, 2023, questioning the legal authority cited by Deason and reiterating his request for release of the motorcycles. (Exhibit 6 – Mot. Alt. Am. and Supp. Aff. filed in Case Nos. 2023-CP-32-00302 and (Exhibit 7) 00304 on August 2, 2023).

52.  On February 14, 2023, at 8:20 AM, Deason sent another email to counsel for the Plaintiff, representing, "I can give you possession of the bikes in 30-45 days if you will dismiss the suits."  (Exhibits 6 and 7)).

53.  On February 14, 2023, at 9:55 AM, counsel for the Plaintiff sent another email to Deason to offer an extension of time,  (Exhibits 6 and 7).

54.  On February 14, 2023, at 1:54 PM, Pincelli sent Deason an email advising, "We met with an investigator on the case today and we need to hold the bikes for now.  It's possible we could turn them back over in the future but for now we need to maintain custody for further investigation."  (Exhibit 3, p. 009).

55.  On February 14, 2023, at 2:04 PM, ten minutes after receiving Pincelli's email, Deason responded to counsel for the Plaintiff, "Ok thanks for the extension."  (Exhibits 6 and 7).

56.  On April 3, 2023, Deason sent an email to counsel for the Plaintiff advising that he had attempted to file motions to dismiss and that "the prosecutor changed his mind and asked [him] to advocate to hold on to them after initially saying we could let them go."  (ECF No. 8 par. 69 and ECF No. 8 – 12; ECF No. 21 par. 33).

57.  On April 4, 2023, Deason filed motions to dismiss the claim and delivery actions with a supporting affidavit from Gietz. Deason asserted in his motions that the subject motorcycle had "significant evidentiary value," while Gietz asserted in an attached affidavit that the motorcycles "*could* have significant evidentiary value."  (Exhibit 8 – Def. Mot. Dism. and Exhibit 9 – Def. Mot. Dism. and ECF No. 8 par. 70 and ECF No. 8 -13;  ECF No. 21 par. 34). [emphasis added].

58.  At 9:26 AM on July 17, 2023, Deason filed a joint memorandum in support of Sheriff's motions to dismiss. (Exhibit 10 – Mem. Supp. in Case Nos. 2023-CP-32-0302 and 0304 on July 17, 2023).

59.  In this memorandum, Deason asserted insufficiency of process (for failure to send copies of the summons and complaints to the Attorney General), the Evidence Preservation Act as a bar to any claim, and failure to join the Solicitor as a necessary party.

60.  The motions to dismiss the claim and delivery actions came before the Honorable Clifton Newman on July 17, 2023, at 2:00 PM.  (Exhibit 11 – Lex. Cty. Mot. Roster 6/13/23; and Exhibits 6 and 7)).

61.  After hearing arguments of counsel, Judge Newman granted the Defendants' motion to dismiss, reiterating, "So on the most limited basis, I'm granting the motion to dismiss with leave to properly perfect service . . . Mr. Deason, if you would draw that up for me, and that would apply to both cases."  (ECF No. 8 par. 72 and ECF No. 8 – 14; ECF No. 21, par. 34).

62.  Counsel for the Plaintiff and Deason exchanged emails on July 19, 2023. (Exhibit 12 – Plt. Init. Discl.).

63.  Therein, counsel for the Plaintiff confirmed his understanding of Judge Newman's ruling, advised that he had already prepared a letter to serve the Attorney General, and reiterated the Plaintiff's need to recover the motorcycles (Exhibit 12)..

64. Deason responded, "Again these vehicles are a pain to keep and store so the sheriff's office appreciates opportunities to get rid of them; however I am constrained by the prosecutor's request to keep them.  I do have a solution, but it will take some patience on your part – I have returned vehicles after plea or conviction based on the attached form and procedure prescribed by the evidence preservation act . . . In addition to the EPA issues, you'll have to overcome the basic 14th amendment implications as to how this affects the criminal defendants' discovery and due process rights."  (Exhibit 12).

65. Deason did not address the Plaintiff's due process rights. (Exhibit 12).

66. The Plaintiff promptly sent copies of the summons and complaint in each claim and delivery action to the Attorney General in accordance with Judge Newman's ruling with copies to Deason.  (Exhibit 13 – Aff. Serv. Cert. Mail in Case No. 2023-CP-32-00302 and Exhibit 14 – Aff. Serv. Cert. Mail in Case No. 2023-CP-32-00304; ECF No. 8 par. 73; ECF No. 21 par. 34).

67. Thereafter, Deason submitted a joint ORDER GRANTING SHERIFF'S MOTIONS TO DISMISS for Judge Newman's consideration.  (Exhibit 15 – Order dated July 24, 2023 in Case Nos. 2023-CP-32-00302 and 00304; ECF No. 8 par. 74; ECF 21 par. 35).

68. Deason's proposed order did not accurately reflect Judge Newman's rulings. (ECF No. 8 – 14).

69. Counsel for the Plaintiff lodged a protest to the proposed order by email to Judge Newman dated July 21, 2023.  (Exhibits 6 and 7).

70. Judge Newman inadvertently signed Deason's proposed order. (Exhibit 15).

71. On August 2, 2023, the Plaintiff filed a motion to alter or amend to address the dismissal of the claim and delivery actions. (Exhibits 6 and 7 and ECF No. 8 par. 75; ECF No. 21 par. 36)

72. On August 7, 2023, Deason filed a memorandum in opposition to Plaintiff's motion to reconsider.  (Exhibit 16 – Mem. Opp. and ECF No. 8, par. 76; ECF No. 21 par. 36).

73. On December 11, 2023, Judge Newman issued an amended order of dismissal without prejudice. (Exhibit 17 – Am. Ord. and ECF No.8 par. 77; ECF No. 21 par. 36)

74. At the time of the incident, the Brock motorcycle had an average retail value of $15,040. As of February 26, 2024, the Brock motorcycle had an average retail value of $10,960. (Exhibit 1, par. 24).

75. At the time of the incident, the Andrzejewski motorcycle had an average retail value of $8.605. As of February 26, 2024, the Andrzejewski motorcycle had an average retail value of $6,180. (Exhibit 1, par. 25).

76. The Plaintiff incurred attorneys fees of $4,740.00 and costs of $295.54 in connection with the unsuccessful claim and delivery action for the Andrzejewski motorcycle. (Exhibit 1, par. 26).

77. The Plaintiff incurred attorneys fees of $3,860 and costs of $250.31 in connection with the unsuccessful claim and delivery action for the Brock motorcycle. (Exhibit 1, par. 27).

78. As of April 19, 2024, the Plaintiff has still not received any notice regarding the seizure of the motorcycles, nor has it received any opportunity to be heard by a neutral factfinder from any of the Defendants. (Exhibit 1, par. 28).

## LEGAL STANDARD

A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. Rule 56(a).

The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, must demonstrate specific, material facts that give rise to a genuine issue. *Celotex*

*Corp.*, 477 U.S. at 323. Under this standard, "the mere existence of a scintilla of evidence" in favor of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Wai Man Tom v. Hospitality Ventures, LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505

## LAW

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law." *U.S. Const. Amend. XIV.* "[A] corporation created by and doing business in a particular state is to be deemed to *all intents and purposes* as a person, although an artificial person, . . . capable of being treated as a citizen of that state, as much as a natural person*." Monell v. Department of Social Services of City of New York*, 436 U.S. 658,  688 (1978) (*quoting Louisville R. Co. v. Letson*, 2 How. 497, 558, 11 L.Ed. 353 (1844)).

"For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). (internal citations omitted).  "[D]ue process requires a 'neutral and detached judge in the first instance.'" *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 617 (1993) (*quoting Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). "At the heart of *Fuentes* is the principle that it is not for law enforcement officers to decide who is entitled to possession of property." *Abbott v. Latshaw*, 164 F.3d 141, 149 (3d Cir. 1998).

A security interest is indisputably a property interest protected by the Fourteenth Amendment. *Mennonite Bd. Of Missions v. Adams,* 462 U.S. 791, 798 (1983); *see also United States v. 41741 Nat'l Rails Way,* 989 F.2d 1089, 1092 (9th Cir. 1993); *United States v. 1 St. A-1,* 865 F.2d 427, 430 (1st Cir. 1989).  A secured creditor has two rights: the *contractual* right to repayment of the debt owed and the

*property* right to the collateral that secures the debt in the event of non-payment.  *See Armstrong v. United States*, 364 U.S. 40. 46, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

"It is well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Fuentes*, 407 U.S. at 85. Put differently, "temporary or partial impairments to property rights . . . are sufficient to merit due process protection." *Ford Motor Credit Co. v. NYC Police Dept.*, 503 F.3d 186, 192(2d Cir. 2007) (*quoting British Int'l Ins. Co. Seguros La Republica, S.A.,* 212 F.3d 138, 141 (2d Cir. 2000); *see also Connecticut v. Doehr*, 501 U.S. 1, 12 ("[T]he State correctly points out that these effects do not amount to a complete, physical, or permanent deprivation… [b]ut the Court has never held that only such extreme deprivations trigger due process concern. To the contrary, our cases show that even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection.") (internal citations omitted). "Here, not only is the present value of the claim diminished by the indeterminacy of its eventual realization, but [the secured creditor's] property interest in the underlying asset suffers, as the vehicle depreciates over time."  *Id.*

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). The doctrine of qualified immunity protects government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan,* 556 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna,* 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."

*Id.* (*quoting Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

Phrased differently, "[t]o be clearly established, the right violated must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (quoting *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4ᵗʰ Cir. 2004)). "This determination 'is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances.'" *Id.* " 'Clearly established' does not mean that 'the very action in question has previously been held unlawful,' but it does require that, 'in the light of pre-existing law the unlawfulness [of the official's conduct] must be apparent.'" *Id.*

The court is not limited to considering decisions from courts of controlling authority in deciding whether a right is "clearly established." "To determine if a constitutional right was clearly established, we must examine controlling authority in this jurisdiction, which includes 'the decisions of the Supreme Court, [this Circuit], and the highest court of the state in which the case arose.'" *Id.* "If 'there are no such decisions from courts of controlling authority, we may look to a 'consensus of cases of persuasive authority' from other jurisdictions if such exists.'" *Id.* (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 – 539 (4ᵗʰ Cir. 2017)).

The role of precedent in establishing liability for specific conduct under this framework is supportive rather than essential. In *Dean ex rel. Harkness*, the Court held,

That there is little precedent imposing liability under these specific circumstances does

not necessarily mean that an officer lacks notice that his conduct is unlawful. As then-

Judge Gorsuch wrote for the panel in *Browder [v. City of Albuquerque, 787 F.3d 1076,*

*1082 – 83 (10th Cir. 2015)]*:

[S]ome things are so obviously unlawful that they don't require detailed explanation and

sometimes the most obviously unlawful things happen so rarely that a case on point is

itself an unusual thing. Indeed, it would be remarkable if the most obviously

unconstitutional conduct should be the most immune from liability only because it is so

flagrantly unlawful that few dare its attempt.

*Id*. at 417 – 18.

Further, the Fourth Circuit Court of Appeals has found that courts "need not—and should not—

assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or

exercising common sense.  In some cases, government officials can be expected to know that if X is

illegal, then Y is also illegal, despite factual differences between the two." *Id*.  (quoting *Williams v.*

*Strickland*, 917 F.3d 763, 770 (4th Cir. 2019)).

Since at least the Second Circuit's 2006 *Krimstock* decision, it has been clear that

owners of vehicles that have been seized as evidence in criminal cases are entitled to

notice of their right to a hearing and "some immediate judicial review of the retention

[of their vehicle]." *Krimstock* [*v. Kelly*, 464 F.3d 246, 248 (2d Cir.2006)].  Indeed, in

that decision, the Second Circuit vacated that part of the district court's ruling holding

that the *Krimstock* notice and hearing rule only applied in the forfeiture context, and

held that the *Krimstock* obligations apply, as well, where a vehicle has been seized as

evidence in a criminal case.

*Ezagui v. City of New York*, 726 F.Supp.2d 275 (2010).

"[A] declaratory judgment action is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (*quoting Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).

"It is well settled that any deprivation of constitutional rights 'for even minimal periods of time' constitutes irreparable injury." *Condon v. Haley*, 21 F. Supp. 3d 572, 588 (D.S.C. 2014) (*quoting Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976))

49 U.S.C. § 30502, effective July 2, 1996, established a National Motor Vehicle Title Information System. This System was created to provide law enforcement, amongst other groups, with "instant and reliable access to information maintained by the States related to automobile titling." 49 U.S.C.A. § 30502(a).

## ARGUMENT

I.   The Defendants violated, and continue to violate, the Plaintiff's Fourteenth Amendment right to due process.

It is undisputed that the Defendants seized and retain the motorcycles in which the Plaintiff maintains a property interest (hereinafter, "the Plaintiff's property"). It is further undisputed that the Defendants have never provided the Plaintiff with notice of the seizure, nor have they provided the Plaintiff with an opportunity to be heard before a neutral factfinder on the propriety of the Defendants' continued detention of the property.  (ECF No. 8 par. 53 and ECF No. 8 – 9; ECF No. 21 par. 22).

Despite Westbury swearing in an affidavit attached to the November 4, 2022, search warrant that there was "probable cause to believe that certain property subject to seizure under provisions of Section 17-13-140, 1976 Code of Laws of South Carolina, as amended [was] located [at Andrzejewski's residence]," the Defendants have repeatedly emphasized that this case does *not* involve a forfeiture:

"To be sure, this is not a civil asset forfeiture case." (ECF No. 19, page 2).  "This is not

an asset forfeiture case." (ECF No. 19, page 15). "There were no plans to forfeit the

motorcycles as instead they were both being held and maintained as material evidence in

a pending criminal matter." (ECF No. 19, page 11).

(Exhibit 3).

The Defendants repeated efforts to distance themselves from any suggestion of a forfeiture

action is odd given that the Plaintiff has not alleged that its property is being held for forfeiture. When

one reviews the relevant sections within the South Carolina Code of Laws, however, the reason for

these statements becomes clear.

S.C. Code Ann. § 17-13-140 provides that "[a]ny magistrate or recorder or city judge

having the powers of magistrates, or any judge of any court of record of the State having

jurisdiction over the area where the property sought is located, may issue a search warrant to

search for and seize" enumerated property. S.C. Code Ann.  § 44-53-520(a) provides a list of

items (including "motor vehicles") that are subject to forfeiture, while § 44-53-520(c) provides

that in the event of seizure of property "subject to forfeiture," proceedings under § 44-53-530

regarding forfeiture and disposition must be instituted within a reasonable time. §44-53-520(i)

requires the law enforcement agency making the seizure to "take reasonable steps to maintain

the property." § 44-53-520(j) requires the law enforcement agency making the seizure to submit

a report to the appropriate prosecution agency "within ten days or a reasonable period of time

after the seizure." The report must provide the "name of lienholder, if any." § 44-53-

520(j)(1)(e). Finally, § 44-53-530 requires that "the Attorney General or his designee or the

circuit solicitor or his designee" must submit a petition for forfeiture to the court within a

reasonable time and must be serve the petition upon owners of record and lienholders.

The Defendants did not, of course, comply with the requirements of S.C. Code Ann. § 44-53-520. Specifically, the Defendants have not produced any evidence to show that they submitted a report on the Plaintiff's property to the appropriate prosecutorial agency "within ten days or a reasonable period of time after the seizure." § 44-53-520(j). Further, given that the property has been exposed to the elements for more than a year and a half, along with the other vehicular detritus in the Sherrif's lots, it's overwhelmingly likely that the Defendants have not taken "reasonable steps to maintain the property." § 44-53-520(i).

Given that the South Carolina Legislature has instituted statutory requirements for the protection of property owners' due process rights *in addition to* those granted by the Fourteenth Amendment for property owners whose property is held for forfeiture, and given that the Defendants would have clearly violated those statutory requirements had the Plaintiff's property been held for forfeiture, the Defendants have taken pains to argue that this case only involves property seized as arrest evidence.

The Defendants thus agree that they cannot avail themselves of any protections or assumptions afforded by S.C. Code Ann. § 44-53-520 and supporting case law because the Plaintiff's property is not being held for forfeiture. Instead, their position is that when property is seized and characterized as arrest evidence, it can be held, indefinitely, without ever providing owners and lienholders with notice and an opportunity to be heard. In other words, the Defendants argue that the due process rights of property owners and lienholders are never implicated so long as detained property is characterized as "evidence."

This position is plainly unconstitutional.

Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. *Fuentes,* 407 U.S. at 80.  "It is well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth

Amendment." *Id*. at 85. A security interest is indisputably a property interest protected by the Fourteenth Amendment. *Mennonite Bd. Of Missions,* 462 U.S. at 798.

The record is clear that the Plaintiff's rights have been affected. For more than a year and a half, the Defendants have exercised control over the Plaintiff's property. (ECF No. 8 par. 53 and ECF 8-9; ECF No. 21 par. 22). The Defendants have never afforded the Plaintiff with notice nor an opportunity to be heard before a neutral factfinder. (Exhibit 1, par. 28). Thus, there is no genuine dispute of material fact as to whether the Defendants have violated, and continue to violate, the Plaintiff's Fourteenth Amendment right to due process. Therefore, the Plaintiff is entitled to summary judgment as a matter of law.

II.     The individual Defendants violated, and continue to violate, 42 U.S.C. § 1983.

42 U.S.C. § 1983 provides, in pertinent part,

Every person who, under color of any statute, ordinance, regulation, custom, or usage,

of any State . . . subjects, or causes to be subjected, any citizen of the United States . . .

to the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws, shall be liable to the party injured . . .

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West,* 487 U.S. at 48. The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law." *U.S. Const. Amend. XIV, § 1*. Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. *Fuentes,* 407 U.S. at 80. "[D]ue process requires a 'neutral and detached judge in the first instance.'" *Concrete Pipe & Prod*s., 508 U.S. at 617.

The record is clear that the individual Defendants violated, and continue to violate, one of the most basic constitutional rights afforded to persons: the right to be free from deprivation of property

without due process of law. A "neutral and detached judge" has never adjudicated the Defendants' retention of the Plaintiff's property, and the Defendants have opposed at every turn the Plaintiff's efforts to put this matter before a neutral and detached judge. (Exhibits 8, 9, 15. and 16). The record is further clear that the individual Defendants violated, and continue to violate, these rights under the color of state law. Therefore, there is no genuine dispute of material fact as to whether the individual Defendants have violated, and continue to violate, 42 U.S.C. § 1983. Therefore, the Plaintiff is entitled to summary judgment as a matter of law.

III.     The individual Defendants are not entitled to qualified immunity because the right to due process is clearly established.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Dean ex rel. Harkness,* 976 F.3d at 413 (*quoting Harlow*, 457 U.S. at 818). In considering a qualified immunity defense, the court must consider whether the official violated a statutory or constitutional right, and if so, whether that right was clearly established at the time of the alleged conduct. *Id.* (citing *Ashcroft,* 563 U.S. at 735).

The individual Defendants conduct was discretionary; there is no statute, regulation, or procedure they have identified that prescribes their conduct. Further, the individual Defendants' conduct has violated a clearly established constitutional right of which a reasonable person would have known.

In this case, a hypothetical, reasonable officer in the position of the Defendants would know that indefinite detention of property without providing the owners and lienholders with due process violates their right to due process. While this court need consider only what the hypothetical, reasonable officer would have thought under the circumstances, in the present case, the evidence before

the court shows that the Defendants were *acutely* aware of the Fourteenth Amendment implications of seizure.

Deason, the general counsel to the Sheriff, responsible for providing the Sheriff and his deputies with legal advice, co-authored a book in which he repeatedly warned law enforcement officials to respect the due process rights of property owners and lienholders, and even provided hypothetical examples to test the ability of law enforcement officials to apply the Fourteenth Amendment to factual scenarios. Further, the sworn affidavit of Westbury, attached to the November 4, 2022, search warrant, demonstrates a familiarity with the law and procedures associated with seizure of property. (Exhibit 3, p 006). It isn't merely the case that the individual defendants, as seasoned law enforcement officials, should have known that their conduct violated the Plaintiff's constitutional rights; instead, the most charitable possible interpretation of their actions, given the facts in the record, is that the Defendants thought that the Fourteenth Amendment only applies to criminal defendants. (Exhibit 12: email from Deason to counsel for Plaintiff dated July 19, 2023 and Tr. in Case Nos. 2023-CP-32-00302 and 00304 p. 8, line 19 and p. 9, line 12).

While this court need not rely on any decisions from the Second Circuit in concluding that a lienholder's right to due process is implicated when property is seized as evidence in a criminal case, it is worth noting that the *Krimstock* cases, as well as *Ezagui*, directly address this issue. In reading those cases, however, it is plain that the courts of the Second Circuit merely applied United States Supreme Court precedent (most notably, *Fuentes*) and the plain language of the Fourteenth Amendment to the facts at hand to conclude that owners and lienholders of property seized as evidence must be afforded due process. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 11. Here, the most charitable possible interpretation of the facts is that the Defendants were plainly incompetent. Because there is no genuine dispute as to whether the right to due process is clearly established, the individual Defendants are not entitled to qualified immunity as a matter of law.

IV.    This Court should grant declaratory relief to afford the Plaintiff and other class members from the "uncertainty, insecurity, and controversy giving rise to the proceeding."

Declaratory judgment is appropriate "when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Centennial Life Ins. Co.*, 88 F.3d at 256.  As explained above, the Defendants' policies and procedures for seizing and detaining property as evidence violates the Fourteenth Amendment procedural due process rights of property owners and lienholders.  Awarding declaratory relief under these circumstances serves the useful purpose of clarifying legal relations and providing relief from uncertainty.  *Id.*

Therefore, this Court should enter declaratory judgment in favor of the Plaintiff, and against the Defendants, as follows:

The Defendants' policies, practices, and customs of impounding vehicles and other property that have been seized as evidence without providing prompt notice to owners and lienholders with interests in the property, and without providing owners and lienholders with an opportunity to be heard at any time in connection with the seizure or potential release of the property, violates the protection against deprivations of property without due process of law enshrined in the Fourteenth Amendment to the Constitution of the United States.

*See TD Auto Fin. LLC v. Cnty. of Putnam,* No. 21CV9080, 2023 WL 6295116, at *14 (S.D.N.Y. Sept. 27, 2023).

V.    The Plaintiff is entitled to nominal damages.

The Plaintiff is not required to demonstrate actual injury and compensatory damages in order to prevail on its § 1983 claim. The United States Supreme Court has explicitly held that a Plaintiff may recover for denial of procedural due process without proof of actual injury:

Because the right to procedural due process is "absolute" in the sense that it does not

depend upon the merits of a claimant's substantive assertions, and because of the

importance to organized society that procedural due process be observed, we believe

that the denial of procedural due process should be actionable for nominal damages

without proof of actual injury.

*Carey v. Piphus*, 435 U.S. 247, 260 (1978). (internal citations omitted).

Because there is no genuine dispute as to whether the Defendants violated, and continue to

violate, the Plaintiff's right to procedural due process, the Plaintiff is entitled to nominal damages as a

matter of law.

VI.     The Plaintiff is entitled to compensatory damages.

Actual injury—not simply a showing that the individual Defendants violated the Plaintiff's

rights—is required for an award of compensatory damages. *See Id*. at 254-64, 266 (discussing the need

to demonstrate actual injury to justify damages exceeding a nominal award). The Plaintiff has

demonstrated that it has suffered depreciation of at least $4,080 and attorneys fees of $4,110.31 in

connection with the Brock motorcycle and $2,424 in depreciation and $5,035.54 in attorneys fees in

connection with the Andrzejewski motorcycle.  (Exhibit 1, par. 24 -27).

Because there is no genuine dispute as to whether the Plaintiff has suffered actual injury due to

the Defendants' violation of the Plaintiff's right to procedural due process, the Plaintiff is entitled to

actual damages as a matter of law of at least those amounts set forth above.

**CONCLUSION**

As Justice Gorsuch noted in *Browder*, "[S]ome things are so obviously unlawful that they don't

require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a

case on point is itself an unusual thing." 787 F.3d at 1082 – 83. The conduct of the Defendants is so

obviously unlawful that, when reduced to its most basic terms, it beggars belief that they have refused

to cooperate with the Plaintiff in implementing basic constitutional safeguards for property owners and lienholders.

The Defendants seized the Plaintiff's property, and the Defendants did not inform the Plaintiff; not immediately, not "within a reasonable time" thereafter, not ever.  When the Plaintiff discovered that its property had been seized, the Plaintiff contacted the Defendants and requested it be returned. The Defendants not only refused to return the property, but represented that it would be "several years" before the Plaintiff *migh*t have their property returned to them. True to their word, more than a year and a half later, the Defendants are still in possession of the Plaintiff's property.

No judge, magistrate, or other neutral factfinder has *ever* ruled on the propriety of this retention. Instead, the Defendants simply determined that their potential need for the Plaintiff's property trumped the Plaintiff's right to possession of its property, and as far as they're concerned, this determination is sufficient to settle the matter. To borrow a phrase from James Acaster, the Defendants' legal justification for refusing both the Plaintiff's request for the return of the property and the Plaintiff's demand for an opportunity to be heard before a neutral factfinder amounts to, "I don't think so, we're still looking at it!" *James Acaster on the Absurdity of the British Empire*, YouTube (Nov. 12, 2019), https://www.youtube.com/watch?v=x73PkUvArJY.

The Defendants conduct does not merely infringe upon the rights of the Plaintiff and other class members, but has also infringed upon the domain of the courts. The Defendants have usurped the authority of the courts in bestowing on themselves the task of deciding who is entitled to possession of property, and absent deterrence, have demonstrated that they will continue to do so.

The Plaintiff is a person. The Plaintiff has been deprived of its property and its Fourteenth Amendment rights to due process. The Plaintiff has suffered damages, including depreciation in the value of its property and costs in efforts to recover the property. Based upon the foregoing, the Plaintiff is informed and believes that it is entitled to summary judgment for the declaratory and injunctive relief

sought, nominal damages, actual damages of at least $15,649.85, a reasonable award of attorneys fees,

and the costs of this action.

<div style="margin-left: 50%;">

STUDEMEYER LAW FIRM, P.C.
By: s/J. Gregory Studemeyer
J. Gregory Studemeyer
Fed. ID #4368
J. Bradley Studemeyer
Fed. ID #13996
7478 Carlisle Street
Post Office Box 1014
Irmo, South Carolina 29063
803-393-4399
greg@studemeyerlawfirm.com
jb@studemeyerlawfirm.com
Attorneys for the Plaintiff

</div>

Irmo, South Carolina
April 19, 2024